# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

JIMMIE and BRANDIE ZAPPIER, )
individually, as parents and next of kin of )
ANTHONY ZAPPIER, deceased, and as )
Co-Administrators of the ESTATE of )
ANTHONY ZAPPIER, )
            )
         Plaintiffs, )
            )
v. ) NO. _____
            )
HAMBLEN COUNTY, Tennessee, ) Jury of Twelve Demanded
a governmental entity; )
ESCO R. JARNAGIN, individually; )
DEWEY EDWARD HORNER, Jr., )
individually; and )
JOHN and JANE DOES 1-5, individually, )
            )
         Defendants. )

---

## COMPLAINT FOR CIVIL RIGHTS VIOLATIONS AND WRONGFUL DEATH

---

Lance K. Baker, Esq., Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: 865-200-4117

F. Clinton Little, Esq., Tenn. Bar #: 033412
**LAW OFFICE OF F. CLINTON LITTLE**
Landmark Center Pavilion
1111 N. Northshore Dr., Suite P-295
Knoxville, TN 37919
Tel:  865-622-4628

Luke D. Durham, Esq., Tenn. Bar #: 031106
**TARPY, COX, FLEISHMAN &**
**    LEVEILLE, P.L.L.C.**
1111 N. Northshore Drive, N. Twr, Ste. N-290
Knoxville, Tennessee  37919
Tel: 865-588-1096

# TABLE OF CONTENTS

I.      NATURE OF ACTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

III.    PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        A.      Plaintiff . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

        B.      Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

IV.     FACTUAL ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

        A.      A "Typical Teenager" With Big Plans for Himself . . . . . . . . . . . . . . .  13

        B.      October 24, 20189: Hanging Out With Family and Friends. . . . . . . .  14

        C.      Multiple 911 Calls Reported a Man Screaming In a Backyard,
                Asking for Help . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

        D.      Dep. Horner Responded, Approached a Distraught Anthony, and
                Immediately Escalated the Situation by Tasing the Teenager, As
                He Was Unarmed and Defenseless On His Back . . . . . . . . . . . . . . . . .  17

        E.      Dep. Horner Kicked Anthony in the Back, Jumped On Top of Him,
                Used His Forearm Against the Back of Anthony's Neck to Smash
                His Face Into the Ground, Then Repeatedly Pepper-Sprayed Him
                – All While Anthony Was Unarmed and On His Knees or Back . . . .  22

        F.      Anthony Tried to Flee After Being Tased, Kicked, Strong-Armed,
                and Pepper-Sprayed While On the Ground, and Got Into the
                Cruiser, Followed by Dep. Horner . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

        G.      Dep. Horner Fired and Shot Anthony at Point-Blank Range and
                Without Warning, Just Seconds After He Climbed Into the
                Passenger Side of the Cruiser . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

        H.      Dep. Horner Got Out of the Cruiser, Withdrew to Safety, and
                Executed the Seriously-Wounded Anthony By Firing Two More
                Shots Into Him From Close Range . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

Case 2:20-cv-00221   Document 1   Filed 10/26/20   Page 2 of 54   PageID #: 2

I.      Medical Examiner's Final Autopsy Report: Anthony's Cause of
        Death Was Multiple Gunshot Wounds . . . . . . . . . . . . . . . . . . . . . . . . .  30

J.      The TBI Conducted a Sham Investigation and Implicitly
        Exonerated Dep. Horner, Notwithstanding His Execution of an
        Unarmed Teenager . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

K.      Dep. Horner Failed to Warn Anthony Before Shooting Him on Both
        Occasions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33

V.      WAIVER OF IMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

VI.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

        COUNT ONE – EXCESSIVE FORCE, VIOLATION OF CIVIL RIGHTS,
        42 U.S.C. §§ 1983 and 1988, Under Fourth and Fourteenth Amendments
        to the United States Constitution (Against Dep. Horner, Individually). . . .  34

        COUNT TWO – FAILURE TO TRAIN AND SUPERVISE, VIOLATION
        OF CIVIL RIGHTS, 42 U.S.C. §§ 1983 and 1988 (Against the County and
        Sheriff Jarnagin, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

        COUNT THREE – WRONGFUL DEATH, TENN. CODE ANN. §§
        20-5-106 et seq. (Against the County, Sheriff Jarnagin, Individually, and
        Dep. Horner, Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  44

        COUNT FOUR – BATTERY (Against the County and Dep. Horner,
        Individually) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

        COUNT FIVE – NEGLIGENCE (Against the County, Sheriff Jarnagin,
        Individually, and Dep. Horner, Individually) . . . . . . . . . . . . . . . . . . . . . . .  47

        COUNT SIX – INTENTIONAL INFLICTION OF EMOTIONAL
        DISTRESS (Against Dep. Horner, Individually) . . . . . . . . . . . . . . . . . . . . . .  48

VII.    JURY DEMAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

VIII.   PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  49

-iii-

**COMES** Jimmie and Brandie Zappier, individually, as parents and next of kin of Anthony Zappier, Deceased, and as Co-administrators of the Estate of Anthony Zappier ("Plaintiffs"), and file this Complaint against the Defendants, Hamblen County, Tennessee, a governmental entity (the "County"); Esco R. Jarnagin, Hamblen County Sheriff, individually ("Sheriff Jarnagin"); Deputy Dewey Edward Horner, Jr., individually ("Dep. Horner"), and John and Jane Does 1-5, individually ("Doe Defendants") (collectively, "Defendants").

## I. NATURE OF ACTION

1.      This action arises out of the reckless and cavalier actions of Hamblen County Deputy Sheriff Dewey Edward Horner, Jr. ("Dep. Horner" or "Dep. Eddie Horner") that resulted in the wrongful death of 19-year old Anthony Zappier ("Anthony") in what was nothing short of an execution.

2.      In the dark early morning hours of October 25, 2019, several residents of Morristown's Wuthering Heights neighborhood called "911" to variously report: a "suspicious person yelling and cursing," a "prowler with a gun and/or laser pointer," or a vehicle in a yard and a "car crash." Dep. Eddie Horner responded and made his way to the location. In route, he received a radio transmission that the suspect had a laser-pointer or a gun with a laser-sight. He radioed for backup.

3.      Dep. Horner was the first to arrive at the Heathcliff Road home of Steve and Carrie Amos, from which at least one of the 911 calls had originated. Dep. Horner pulled into the Amos's lower driveway and quickly spotted a young Caucasian male –

-1-

later identified as Anthony – in the Amos's backyard, walking toward the road. Dep. Horner parked his cruiser (leaving the engine running), turned on his scene-lights, shined his spotlight on Anthony, and approached Anthony.

4. Five minutes and twenty-one seconds (5:21) later, Anthony would be dead of multiple gunshot wounds to the head and chest, the victim of a senseless fatal shooting – tantamount to an execution – by Dep. Horner, subsequently sanctioned by the Tennessee Bureau of Investigation ("TBI"), the County, and Sheriff Jarnagin.

5. Before he killed Anthony, however, Dep. Horner had countless opportunities to de-escalate a non-violent situation. Upon initially exiting his cruiser, Dep. Horner's body-cam video recording shows the tall, lanky Anthony standing shirtless – unclothed except for a pair of boxer-type shorts and flip-flops – his arms raised. Dropping to his knees, the undeniably distraught teenager repeatedly pleads with Dep. Horner to get his father on the phone ("Please, I'm asking politely, please").

6. Dep. Horner paid little attention to Anthony's plea, and instead approached Anthony to check him for weapons. Anthony acceded, remaining on his knees, his back to Dep. Horner. Then, Dep. Horner noticed a pistol on the ground behind Anthony, picked it up, pulled out his Taser, and threw the gun as far away as he could. When Anthony suddenly turned toward Dep. Horner, Dep. Horner said "stop" and aimed his Taser at the unarmed teenager – who was on his back and pleading with Dep. Horner to help him. But Dep. Horner had already made up his mind, and although Anthony appeared to pose no threat to him, Dep. Horner proceeded to fire his

-2-

Taser "two or three times" at Anthony,[1] kick him in the back/head, jump on the defenseless teenager's back, and then pepper-spray him.[2]

7.       Tased multiple times, kicked to the ground, and strong-armed, Anthony was eventually able to free himself from underneath the much larger and stronger man who was also armed to the hilt, and fled on-foot toward the road, pursued by Dep. Horner. Anthony soon reached Dep. Horner's unlocked and still-running cruiser in the Amos's driveway, as Dep. Horner continued to try to pepper-spray him. Anthony was able to climb into the driver's seat, while Dep. Horner got into the passenger-side with his knees in the seat and facing Anthony, as the cruiser moved into the backyard.

8.       After the cruiser had traveled a short distance (about 500 feet), Dep. Horner pointed his 9-mm Glock 17 at Anthony and fired from point-blank range, as shown by the recorded muzzle-flash. Anthony's body convulsed, he screamed "no," and then quickly lost control of the cruiser, which went through a plastic boundary-fence and into a plowed dirt field, slowing to a stop in thick brush. Gunshot, Anthony

---

[1]Under optimal conditions and deployment, a Taser X26P shoots 2 darts attached to 25 feet of wire and carrying 50,000 volts. By comparison, static electrical charges of 25,000 volts are not uncommon from door knobs, filing cabinets, or other metal objects.

[2]Following Anthony's death, Dep. Horner implied that he had feared for his safety. There is no basis in fact for such fear. Anthony weighed less than 160 pounds and, stripped to his waist, wearing only boxer-type shorts, was clearly unarmed. In contrast, Dep. Horner was a well-armed HCSO deputy, wielding an array of weapons, including a baton, pepper-spray, a Taser, and a duty weapon (a 9 mm Glock 17). What's more, if Dep. Horner considered Anthony to be a threat at this stage, he could have waited for the back-up he had told to "step it up." He also could have tried to use de-escalation skills, but did not.

-3-

instinctively tried to shield himself from further bullets with his bare hand, as he saw Dep. Horner trying to fire at him again. But Dep. Horner's gun jammed, prompting him to vigorously rack the slide to clear the gun so he could fire again. By this point, the cruiser had stopped and Dep. Horner was standing outside. At that moment, he extends the gun into the cruiser and fires two or three more rounds, striking Anthony twice and killing him instantly.

9.     From the moment he tased Anthony until he fatally shot him about two minutes later, Dep. Horner actions unnecessarily, unreasonably, and recklessly escalated a non-violent situation into a volatile confrontation, and then a deadly one. Video evidence makes clear that there was no legitimate or justifiable reason for Dep. Horner to escalate the situation, much less to tase the teenager, kick him, strong-armed him, shoot him at point-blank range, and then execute him when he posed no threat or danger to anyone.

10.     In all, Dep. Horner shot Anthony three times. According to the Regional Medical Examiner's autopsy, two of the shots were rapidly fatal (one went through the top of Anthony's head near the crown, another traveled through his chest, piercing his lungs and heart), while the third bullet traveled through Anthony's maxilla and exited through the helix.

11.     After the shooting, at the request of the District Attorney for the Third Judicial District, the Tennessee Bureau of Investigation ("TBI") conducted an investigation. The agency made no official recommendation, but merely turned its findings over to a Hamblen County Grand Jury, which predictably concluded, based

-4-

upon the TBI's investigative file, that Dep. Horner had "followed law enforcement protocols." In short, the TBI made numerous material findings that appear to be largely at odds with video and other evidence, particularly its findings:

- that Dep. Horner "was dragged" when Anthony was driving the cruiser (he was not);

- that Anthony "grabbed" or gained control of Dep. Horner's Glock 17 in the cruiser (he did not); and

- that Dep. Horner "fired three rounds striking [Mr.] Zappier in the head and chest" (this is misleading, as Dep. Horner initially fired once, seriously wounding Anthony, then his gun jammed, prompting him to rack the slide several times and clear it, by which time he was outside of the cruiser, where he fired two more rounds into Anthony.

12.    The TBI also found no fault in Dep. Horner's multiple tasing of a defenseless Anthony as he laid on the ground and begged for help; or in Dep. Horner kicking the teenager down to the ground; or that Dep. Horner jumped on Anthony's back and forearmed his neck so hard his face smashed into the ground; or that Dep. Horner tried to pepper-spray Anthony, seemingly at every opportunity.

13.    Dep. Horner could have made a serious effort to talk to Anthony, but he didn't. Although he recognized that Anthony was "distraught," he chose to ignore his distress, opting for a confrontation. Dep. Horner could have also waited for back-up, as they were moments away (they arrived about a minute after the shooting), but he didn't. If he had only been adequately trained to employ de-escalation techniques or alternatives to force, Anthony might still be alive.

14. From the moment he approached Anthony, Dep. Horner's actions repeatedly escalated the situation until he shot and killed Anthony, including shooting him twice after Dep. Horner had jumped safely out of the cruiser, as Anthony sat – gunshot and bleeding – in the driver's seat.

15. Besides all of this, it is astounding that at no point during his five-minute and twenty-one second (5:21)-encounter with Anthony did Dep. Horner ever warn the teenager that he was going to use force on him. He did not warn Anthony that he was going to tase him. He did not warn Anthony that he, a much larger man, was going to try to physically subdue him. He did not warn Anthony that he was going to pepper-spray him. And most importantly, Dep. Horner failed to warn Anthony that he was going to shoot him – on either occasion.

16. When Dep. Horner aimed his Taser at Anthony, the teenager posed no imminent threat of danger to him. Any later threat was a result of Dep. Horner's reckless actions, *e.g.*, jumping into the passenger's side of the moving cruiser. Accordingly, Dep. Horner's use of deadly force can hardly be considered reasonable.

17. A reasonable, trained, skilled, or proficient officer in Dep. Horner's circumstances would not have believed deadly force was necessary, or that it was measured or patterned for the circumstances presented. The unconstitutional consequences of failing to train and supervise deputies in the reasonable use-of-force, including deadly force, are so patently obvious that the County is liable under § 1983.

18. Among other rights possessed by Anthony, "[i]t has been clearly established in this circuit for some time that 'individuals have a right not to be shot

-6-

unless they are perceived as posing a threat to officers or others.'" *Ciminillo v. Streicher*, 434 F.3d 461, 465-66 (6th Cir. 2006). Here, an unarmed, gunshot, and seriously-wounded teenager posed no threat to anyone as he sat bleeding in the driver's seat of Dep. Horner's cruiser. Yet, Dep. Horner shot Anthony twice after he had withdrawn to safety.

19. Nor may an officer escalate force where an arrestee is complying. *Sample v. Bailey*, 409 F.3d 689, 700 (6th Cir. 2005). When a suspect's hands are free and he has "done no more than made a minor stubbornness," the Sixth Circuit has held that it is excessive for an officer to restrain the suspect "by tackling, stepping on, and punching him." *Malory v. Whiting*, 489 F. App'x 78, 85 (6th Cir. 2012)). Here, Anthony was distraught – and although pleading for help – was obeying Dep. Horner's screamed and fairly unintelligible commands as best as he could – as he laid on his back on the ground. Finally, to the extent Dep. Horner suggests that discovery of the gun behind Anthony justified his use of the Taser, etc., precedent in this Circuit clearly holds that an officer must encounter some level of resistance (beyond a minor stubbornness) to justify using a taser. The mere possession of a gun is not, in and of itself, "resistance," unless coupled with something more, *e.g.*, physical or verbal action. *Correa v. Simone*, 528 Fed App'x 531, 535-36 (6th Cir. 2013). At the moment Dep. Horner began repeatedly tasing Anthony and kicked him to the ground, the teenager's level of resistance, if any, was negligible, at most.

20. At the point in which Dep. Horner tased Anthony, the teenager was suspected, at most, of trespassing, a Class C misdemeanor. He was unarmed and

-7-

wearing nothing but boxer-like shorts and flip-flops. He was on his back on the ground, as Dep. Horner had demanded, pleading for Dep. Horner's help. At this moment, as video shows, a distraught Anthony presented a danger to no one.

21.     Defendants, acting under color of law, deprived Anthony of his constitutional rights under the Fourth Amendment and caused his wrongful death. By this action, brought under 42 U.S.C. § 1983 and Tennessee law, Plaintiffs make the following claims:

- Count One – 42 U.S.C. § 1983 – various instances of excessive use-of-force by Dep. Horner against Anthony under the Fourth and Fourteenth Amendments;

- Count Two – 42 U.S.C. § 1983 – failure of the County and Sheriff Jarnagin to properly train and supervise deputies with respect to the use of force, including deadly force;

- Count Three – wrongful death;

- Count Four – battery;

- Count Five – negligence; and

- Count Six – intentional infliction of emotional distress.

22.     Plaintiffs seek all compensatory damages available to them and Anthony's Estate, including, but not limited to, damages for (a) excruciating physical pain and suffering before Anthony's death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before Anthony's death; (c) lost-earnings and/or loss of earning capacity in the future based on the probable duration of Anthony's life if the

-8-

death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of Anthony's life if the death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Anthony's Estate, through the Plaintiffs; and (f) loss of consortium or society by Plaintiffs, individually, as Anthony's parents. Plaintiffs further request punitive damages against Dep. Horner, individually, as well as attorneys' fees, costs, expenses, and all other available and appropriate relief.

## II. JURISDICTION AND VENUE

23.     This civil action is brought to redress alleged deprivations of constitutional rights as protected by 42 U.S.C. §§ 1983, 1988, and the Fourth and Fourteenth Amendments of the United States Constitution, and for violations of related Tennessee common law torts. Original jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343.

24.     This Court also has supplemental jurisdiction over any claims brought under Tennessee law, pursuant to 28 U.S.C. §1367, as such claims are so related to claims in the action within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the Constitution.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as all incidents, events, and occurrences giving rise to the action occurred in Hamblen County, within the Northeastern Division of the Eastern District of Tennessee.

### III. PARTIES

**A.   Plaintiffs**

26.   Anthony Zappier was a citizen and resident of Jefferson County at the time of his death. Anthony's parents, Plaintiffs Jimmie Zappier and Brandie Zappier, are the lawful and duly-appointed Co-Administrators and personal representatives of their son's Estate, appointed as such by the Probate Division of the Chancery Court for Jeffferson County, Tennessee, by order dated October 23, 2020.[3]

27.   Plaintiffs also bring this action individually, as Anthony's parents and next of kin, to recover for loss of Anthony's consortium or society. During all relevant times, Plaintiffs have been citizens and residents of Jefferson County, Tennessee.

**B.   Defendants**

28.   Defendant, Hamblen County (the "County") is a governmental entity and political subdivision of the State of Tennessee, duly organized. It may be served through its chief executive officer, Mayor Bill Brittain, at the Hamblen County Courthouse, 511 West Second North Street, Morristown, TN 37814. The County possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting all facets of the training, supervision, control, employment, assignment, and removal of individual members of the Hamblen County Sheriff's Office

---

[3]Anthony was unmarried, was not survived by a spouse, and he had no children.

("HCSO"), and to assure that actions, policies, rules, regulations, practices and procedures of the HCSO and its employees comply with the laws and constitutions of the United States and Tennessee.

29.     The County is responsible for training and certifying its law enforcement employees and implementing procedur0s and protocols to honor and respect the Due Process rights of citizens with whom its law enforcement employees interact.

30.     In this case, the County and the HCSO acted through their agents, employees, and servants, including policymakers like Defendant, Sheriff Esco R. Jarnagin ("Sheriff Jarnagin"), who is sued herein in his individual capacity and as principal on his official bond. At all times material hereto, Sheriff Jarnagin was operating under color of law.  Sheriff Jarnagin is, upon information and belief, a citizen and resident of Hamblen County and may be served at the Hamblen County Sheriff's Office, 510 Allison St Morristown, Tennessee 37814-4057.

31.     At all times material hereto, Sheriff Jarnagin was the duly elected County Sheriff, responsible for the screening, hiring, firing, training and the supervision of HCSO employees, including approximately forty-five (45) deputies.

32.     At all times material hereto, Sheriff Jarnagin also possessed the power and authority and was charged by law with the responsibility to enact policies and to prescribe rules and practices concerning the use of force, including the use of firearms and deadly force, by HCSO deputies.

33.     At all relevant times, Defendant, Dewey Edward Horner, Jr. ("Dep. Eddie Horner" or "Dep. Horner"), was employed by the HCSO as a deputy. Dep. Horner is

sued in his individual capacity and as principal on his official bond. At all relevant times, Dep. Horner was operating under color of law. Dep. Horner is, upon information and belief, a citizen and resident of Hamblen County and may be served with process at the Hamblen County Sheriff's Office, 510 Allison Street, Morristown, TN 37814.

34. Plaintiffs also sue fictitious Defendants, referred to herein as John and Jane Does 1-5, as their true identities and/or capacities and/or other facts showing their culpability are presently unknown. These Defendants are also sued in their individual capacities as HCSO employees or deputies, and as principals on their official bonds, if any.[4]

35. Various persons not made Defendants, including County or HCSO officials, have participated in violations asserted herein and performed acts or made statements in furtherance thereof. Plaintiffs reserve the right to name some or all of these persons as Defendants, as they become known.

---

[4]Under Rules 4(m) and 15(c) of the Federal Rules of Civil Procedure, Plaintiffs may seek leave of Court to amend their Complaint to set forth the true names and capacities of such Defendants once their identities are ascertained.

## IV. FACTUAL ALLEGATIONS[5]

### A.    A "Typical Teenager" With Big Plans for Himself.

36.    Anthony Zappier ("Anthony") was a typical teenager, just nineteen (19) years old when he was shot and killed by HCSO Dep. Eddie Horner on October 25, 2019. Anthony had been diagnosed with bipolar disorder, but was not medicated for it. He had loving parents and three siblings, and they were a close-knit family. His family and friends characterized Anthony as very giving and vibrant, having an infectious smile and seemingly boundless energy. He had graduated from high school and was looking forward to continuing his education.

37.    Anthony was competitive, enjoying and excelling in athletics, including soccer, track, cross-country, basketball, and football. He grew up around his family's pizzaria business – Anthony's Pizza & Subs, Inc. – and worked there part-time when he was in school. Since graduating, Anthony had been working longer hours, learning the business-end of his family's restaurants.

---

[5]The allegations set forth herein are derived from multiple sources, including, but not limited to, interviews with multiple witnesses, the Tennessee Bureau of Investigation ("TBI") investigative file, including incident reports, body-cam video(s), preliminary and final autopsy reports from the Regional Medical Examiner's Office (Knox County), scene photographs, diagrams, and drawings, witness interview audio-files, transcripts, or summaries, forensic function and toxicology reports, and other documentary or forensic evidence, lists, or inventories produced by the TBI. Counsel represented Plaintiffs in obtaining appointments as personal representatives of their son's Estate. They also reviewed media reports, social media reports and pages, responses to their public records requests, various maps, and Grand Jury proceeding results. Lastly, the undersigned also interviewed several members of Anthony's family, and a number of his friends.

-13-

38.     Working in the family business instilled family values in Anthony, as he realized the virtue and benefits reaped by hard work. It also allowed Anthony to appreciate what it meant to serve your community. Eventually, Jimmie and Brandie, Anthony's parents, planned for their son to take over the business. They recognized Anthony as highly-motivated, as he had set a number of life-goals for himself. Jimmie and Brandie had big plans for their son, and he certainly had big plans for himself.

**B.     October 24, 20189: Hanging Out With Family and Friends**

39.     Early in the afternoon of October 24, 2019, Anthony and a close friend had driven to Knoxville to visit Anthony's sister and her boyfriend. The two young men had returned to Morristown by around 8:00 p.m. that evening.[6]

40.     At around 1:00 a.m. in the early morning of October 25, 2019, Anthony and four of his friends visited another friend's house in Morristown's Wuthering Heights community. The teenagers played video games, as they were "chilling out, talking, and listening to music" in the family's basement, chaperoned by the friend's parents, who were at home and upstairs. Ultimately, all of the friends, except Anthony,

---

[6]Anthony's friend made it very clear that he did not observe Anthony drinking alcohol or using drugs of any kind while they were together for about seven or so hours on that day, at least up until about 8:00 p.m. that evening. He did not see Anthony again until about five hours later (approximately 1:00 a.m.) on the following morning, October 25, 2019, the final few hours of Anthony's life.

-14-

spent the night. Anthony visited for about 20 minutes, but left the house by about 1:30 a.m.[7] For the next four hours, until about 5:30 a.m., nothing is known of Anthony's whereabouts or actions.

### C. Multiple 911 Calls Reported a Man Screaming In a Backyard, Asking for Help.

41.     Between 4:00-5:00 a.m. in the dark early morning hours of October 25, 2019, JC Morgan heard a "thump" outside his home in Wuthering Heights. Mr. Morgan assumed that a vehicle had driven over the curb and entered a field below his home. He next heard "someone cussing and screaming out the name Kate." Mr. Morgan's wife, Pamela, heard a noise at the same time. She said it sounded like a car accident close to her house. Like her husband, Mrs. Morgan also heard a lot of screaming. She went outside and saw a man "screaming and acting like he was talking to someone." The man told her to call 911 and told her that he needed help. Naturally, Mrs. Morgan immediately called 911.[8]

42.     Soon after Mrs. Morgan called 911, the Morgans observed an officer arrive in a patrol car, get out, and walk towards the man who had been screaming. The man told the officer not to come any closer, but repeatedly asked him to call his dad. By then, according to the Morgans, the man was standing shirtless with his hands up in

---

[7]Counsel has interviewed two of Anthony's friends who were present at the house and both stated that Anthony was neither intoxicated nor "high" on drugs of any kind when he left the house a little before 1:30 a.m.

[8]Mr. Morgan recalled that "he could see that the subject had a laser in his hand that he thought was a laser pointer or a laser sight mounted onto a gun."

the air. The man eventually got on his knees, and kept his hands up. The Morgans believed the man was very agitated, and noticed that he continued to tell the officer to call his dad. According to Mrs. Morgan, "when the officer got close to him, a scuffle happened" and she "heard a Taser." The Morgans "heard three shots," but Mrs. Morgan did not see any guns.

43.     Steve and Carrie Amos lived on the 3000 block of Heathcliff Road in Wuthering Heights. In the early morning hours of October 25, 2019, Mrs. Amos woke up to hear someone shouting outside her house. She woke up her husband. Both of them could hear someone shouting profanities and saying things like "someone should call 911" and calling for "Jesse." Mr. Amos called 911, went to the window, and watched the man in his lower driveway walking toward the back of his house.[9]

44.     Moments later, Mr. Amos saw an officer arrive and park his cruiser in the Amos's lower driveway. The officer was giving the man verbal commands. The man was initially compliant. "As the officer approached, the suspect turned around and started yelling at the officer telling him not to come towards him and to call his dad." Mr. Amos said, "the officer picked up a phone off the ground and when he did the suspect turned towards the officer." According to Mr. Amos, "when the officer approached to put the suspect in handcuffs, the suspect jumped up and the officer deployed his taser." Then, a "scuffle" occurred, and he saw "the cruiser take off into the grass." He lost sight of it as it drove through the field. He did not hear gun shots.

_____

[9]Like his neighbor, Mr. Morgan, Mr. Amos also "saw a laser light and thought the person might have a pistol."

### D. Dep. Horner Responded, Approached a Distraught Anthony, and Immediately Escalated the Situation by Tasing the Teenager, As He Was Unarmed and Defenseless On His Back.

45.     At about 5:30 a.m., on October 25, 2019, Dep. Eddie Horner received word on his radio of the 911 calls. As he was about four or five minutes away from Wuthering Heights, he responded and made his way there. Along the way, he heard dispatch say "something about a possible firearm." He radioed for backup to assist him.

46.     Dep. Horner arrived at the scene and pulled into the Amos's lower driveway and parked.[10] From there, he spotted 19-year old Anthony Zappier in the Amos's backyard, walking toward the road. In an interview, Dep. Horner told TBI Special Agent Erica Stoner ("SA Stoner") that once Anthony saw him, he "takes his shirt off and throws his hands up." Dep. Horner exited his cruiser, reached back in and activated his scene-lights, fixed his spotlight on Anthony, and shut the car door. As he did this, he told Anthony to "keep your hands up" and "face your car."[11]

---

[10]As he pulled into the driveway, Dep. Horner's body-cam video was activated. The video last twenty-five minutes and twenty-three seconds (25:23), stopping when Dep. Horner de-activates his body-cam video. Most of the factual allegations herein can be accurately tracked on the video by identifying the minute and second on the video counter where the referenced action occurs. *E.g.*, as Dep. Horner pulls into the the driveway, the counter starts at 00:01.

[11]Based upon photos and diagrams of the scene, Anthony was about 120 or so feet away from Dep. Horner's cruiser, which was parked in the driveway. Anthony's Ford Fusion was parked about 300 feet away from the driveway and about 120 feet behind Anthony in the backyard or field, Anthony having apparently pulled off into the field from the road (according to visible tire tracks).

-17-

47.     At 00:50 of the video, Dep. Horner started to approach Anthony. The video reveals a shirtless, young Caucasian male – wearing white boxer-like shorts and what appears to be flip-flops – with his hands raised in the air. Dep. Horner said, "let me make sure that you're okay." Anthony responded, "Ok, I'm okay."[12]

48.     As Dep. Horner continued to walk toward him, Anthony, still on his knees, pleaded with him to get his father on the phone, saying "please, I'm asking politely, please." According to Dep. Horner, Anthony was behaving "like he don't even know where he was at. Like he was very distraught," and was "screaming at the top of his lungs."[13] Dep. Horner stopped, made a feeble effort to communicate with Anthony, and got on his radio to tell his backup to "step it up."

49.     Beginning at 2:43 of the video, Dep. Horner started walking closer to Anthony, who was still on his knees. All the while, Anthony continued to plead with

---

[12]At this point, Anthony's only offense, if any, was criminal trespass, Tenn. Code Ann. § 39-14-405, a Class C misdemeanor. In Tennessee, Class C misdemeanors are the least serious misdemeanors, punishable by up to 30 days in jail, a fine of up to $50, or both. Tenn. Code Ann. § 40-35-111(e)(3).

[13]According to Dep. Horner, Anthony appeared to be "on something." The TBI toxicology report indicated that Anthony tested "positive" for cocaine and had marijuana in his system. However, while the level of marijuana was quantified, according to the Regional Medical Examiner, when the toxicology was done in this case, the TBI had changed its policy to no longer quantify the amount of cocaine or cocaine metabolites. Instead, the TBI only determines whether cocaine is present. Thus, the toxicology report for Anthony only identified some level of cocaine in his system, but not how much, or when or how it was ingested. Therefore, the "positive" result was not indicative of cocaine use on the day of his death. As far as marijuana goes, all the report reveals is that he smoked marijuana within roughly twenty-four (24) hours before he died.

Dep. Horner to call his father. Given the circumstances,[14] there appeared to be no need or other urgency for confronting Anthony at this juncture. Nevertheless, Dep. Horner did so, saying, "let me check you for weapons, okay."

50.     At about 2:59 of the video, Dep. Horner asked Anthony, "what's your name?" Anthony, still facing away from Dep. Horner, started turning toward him to answer, prompting Dep. Horner to tell him, "no, no, no, do not face me, do not face me." At around 3:05, Anthony turned again to face away from Dep. Horner, with his hands slightly raised.

51.     At 3:05, Dep. Horner began to probe around Anthony, and said, "I just want to make sure you don't have any weapons." At that moment, with his right hand, Dep. Horner reached to the ground and picked up what appears to have been a handgun (only partially visible). At no time, however – from the moment Dep. Horner

---

[14]After all, by the time Dep. Horner exited his cruiser, Anthony was down on his knees, hands raised over his head, stripped to his waist, and wearing boxer-like shorts and flip-flops that could hardly have concealed a weapon. He was not holding a weapon and did not – by any reasonable account – appear to be a threat to the well-armed Dep. Horner. Instead, based upon the first few moments of video, Anthony – who had been diagnosed as having bipolar disorder – appears to have been suffering from some sort of mental or emotional crisis. Even Dep. Horner characterized Anthony as "distraught." There did not appear to be a rational basis for confronting Anthony at that moment – much less using any modicum of force or arresting him – particularly before backup arrived. Indeed, Dep. Horner never told Anthony that he was "under arrest" or said anything of this ilk to SA Stoner.

-19-

pulled up to the scene until the moment Dep. Horner killed him – did Anthony ever have a handgun in his hand or even threaten to use one.[15]

52.     As Dep. Horner continued his probe for weapons, at 3:09, Dep. Horner grabbed Anthony's left arm with his left hand,[16] and Anthony, still on his knees, spun around and turned to Dep. Horner, and began to get up. Dep. Horner said "stop."[17]

53.     At 3:10, Dep. Horner drew his Taser[18] and aimed it at Anthony's chest, as the teenager folded his arms against his chest to protect himself. At 3:12, Anthony slowly backed away, raised his arms, and dropped back to his knees, complying with Dep. Horner's commands, just as Dep. Horner's Taser's laser-sight beamed on

---

[15]Of course, deputies are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. For this reason, hindsight is usually not a reliable tool in assessing the reasonableness of an officer's actions. Unfortunately, Anthony is dead, unable to contradict Dep. Horner's own version of the events, or explain why he was there, or his state of mind, as Dep. Horner repeatedly did in his TBI interview with and statement to SA Stoner. Thus, Dep. Horner's self-serving accounts should be viewed with circumspection.

[16]Although Dep. Horner asked Anthony if he could "check him for weapons," a request Anthony quickly agreed to, Mr. Amos stated that Dep. Horner attempted to handcuff Anthony, and this prompted Anthony to "jump up," as Dep. Horner had said he was only going to "check him for weapons," not arrest him.

[17]Dep. Horner radios that Anthony "had a gun on him. I've got it."

[18]During the 1990s, the TASER was introduced to law enforcement as an alternative to deadly force. It became a non-lethal alternative to the use of deadly force where the baton was insufficient to control persons. As of 2020, about 94% of the country's roughly 18,000 police agencies now issue TASERs.

-20-

Anthony's stomach and chest. Dep. Horner approached Anthony, inexplicably yelling at him to get on the ground (at this point, Anthony was on his back on the ground).

54.     At 3:14, as Anthony was still on his knees, he instinctively slapped at the Taser with his left hand. At 3:16, he turned away from Dep. Horner and – still on his knees – puts his hands on the ground, turning over onto his back. At 3:21, Anthony turned onto his stomach.[19]

55.     At 3:23, Dep. Horner moved closer to Anthony, who was on his back on the ground. By this point, Dep. Horner stood menacingly over the slight teenager, screaming at him, as Anthony, still on the ground, pleaded with him for help.

56.     Then, in an eerie preview of what would happen less than two minutes later, Dep. Horner told Anthony to "relax." At 3:31, just as a defenseless Anthony said, "please help me, please help me," Dep. Horner fired his Taser, hitting Anthony, who winced and screamed in pain.[20]

---

[19]The TBI summary of the interview with Dep. Horner indicates that he was attempting to handcuff and arrest Anthony as Anthony was on the ground. The summary indicates that Anthony initially complied with Dep. Horner's requests to get on the ground to allow him to affect his arrest, but "struggled and was able to get away," then struck Dep. Horner in the head/face. However, the video does not support this version of events. At no point did Dep. Horner instruct Anthony that he was "under arrest."

[20]Why did Dep. Horner tase Anthony? He told SA Stoner that Anthony was "irate and screaming," so "I tased him." Dep. Horner also told SA Stoner, "I see a gun . . . so, I pulled my Taser and grabbed the gun, and I'm telling him to get on the ground, get on the ground, and he's not listening. So, I tase him and I chuck that pistol. I throw it as far as I can throw it." As to why Dep. Horner tased Anthony after he had disposed of the gun, Dep. Horner's explanation made little sense. In his formal written statement to the TBI, he said: "I'm trying to calm him down as I approach, and finally get him calmed down enough to ask him if I can search him for weapons. He agrees and gets on the ground. I walked up behind him and saw a

-21-

**E.  Dep. Horner Kicked Anthony in the Back, Jumped On Top of Him, Used His Forearm Against the Back of Anthony's Neck to Smash His Face Into the Ground, Then Repeatedly Pepper-Sprayed Him – All While Anthony Was Unarmed and On His Knees or Back.**

57.  At 3:35, Dep. Horner then raised his leg and appears to have kicked Anthony hard in the back. Anthony started to crawl away, but Dep. Horner got over him.[21] At 3:37, as evidenced by video and as witnessed by both JC Morgan and Steve Amos, Dep. Horner jumped on Anthony's back.[22] By 3:43, Dep. Horner was on

---

pistol laying on the ground behind the subject. He stands up and gets back down several times. When I saw the pistol, I grabbed it and pulled my taser. I don't remember if I pulled my taser and then picked up the gun or vice versa but I do remember that once I had the gun, I threw it as far as I could throw it." The TBI reported that a Smith & Wesson pistol with a laser-mounted sight was found in the field.

[21]Dep. Horner implied that Anthony was unfazed by being tased. This is nonsense. The effects of being tased may only be localized pain or strong involuntary long muscle contractions, based on the mode of use and connectivity of the darts. AXON, the maker of Tasers used by many law enforcement agencies, suggests various causes for a Taser's limited effectiveness, including a miss or single dart hit, close probe spread, incomplete, broken, or intermittent circuit, loose or thick clothing, low nerve or muscle mass, and operator error.

[22]Dep. Horner's TBI statement to SA Stoner said, "I then tased the subject but it didn't seem to have any effect so I got on top of the subject in an attempt to physically control him until my backup arrived." In his recorded TBI interview with SA Stoner, Dep. Horner stated, "The taser didn't seem to do much. I'm a big dude, and I jump on top of him." He further told SA Stoner, "I'm thinking if the Taser isn't going to do it then maybe I can." Dep. Horner would have presumably received some form of training on Tasers. Dep. Horner would have received this information when he was trained on the use of a Taser. From a practical perspective, one needs to be within a relative mid-range, as far as 15-25 feet, in order to use a Taser. If a subject is too close, then a Taser would not be effective. Notably, the TBI did not measure how far away Dep. Horner was from Anthony when he triggered the Taser. However, the video appears to show Dep. Horner at a less than optimal distance from Anthony to effectively tase him.

-22-

Anthony's back,[23] with his left forearm pressed hard against the back of Anthony's neck, Anthony's face now smashed firmly into the ground. At that instant, Dep. Horner grabbed the back of Anthony's head and smashed it down into the ground.[24]

58.     By 4:34, Anthony had slithered free from Dep. Horner's grasp[25] and had gotten up, facing Dep. Horner – who was armed with a 9 mm Glock 17, a Taser, pepper-spray, and a baton. At 4:40, Dep. Horner extended his right arm and tried to use his pepper-spay on Anthony.[26] Anthony slapped at the device with what may have been Dep. Horner's flashlight, knocking Dep. Horner's eyeglasses off.[27]

---

[23]The electrical arcing and sparking noise from the Taser can be heard repeatedly, as Dep. Horner continues to try to taze Anthony.

[24]Dep. Horner allegedly radioed that Anthony was "fighting" him and "had a knife." There is no evidence, video or otherwise, including the TBI evidence inventory from the scene, that Anthony had a "knife," or, for that matter, that he "was fighting" with Dep. Horner (at least until Dep. Horner tased him when he was on his back, kicked him in the back, jumped on him, and pressed hard on his neck and smashed his face into the ground).

[25]Although the TBI summary indicates that Anthony "threw the officer off his back" and Dep. Horner stated, "when I got on the subject's back to try to control him, he threw me off like 'I was nothing' and jumped up again," this is contradicted by the video (and common sense). Video appears to show the shirtless Anthony able to slide out from underneath Dep. Horner's grasp. Besides, Dep. Horner characterizes himself as "a big dude." Anthony, weighed less than 160 pounds.

[26]Dep. Horner told SA Stoner: "I'm up at this point, and I go to pepper spray him . . . . I can't see."

[27]According to the TBI, Dep. Horner reported that after he tased Anthony, he dropped the Taser and Anthony picked it up and pointed it at him. Yet, Dep. Horner also said that he *could not see* after he lost his eyeglasses and was not sure what Anthony had in his hand: "So, now I'm blind. And I remember him pointing something at me. I'm not sure exactly what it was. If I want to guess, it was my Taser." Video shows that Anthony never picked up the Taser. He did, however, apparently pick up a flashlight, which is shining in his right hand as he ran away.

-23-

**F.    Anthony Tried to Flee After Being Tased, Kicked, Strong-
Armed, and Pepper-Sprayed While On the Ground, and Got
Into the Cruiser, Followed by Dep. Horner.**

59.    By 4:44, Anthony had started to run toward the driveway, where Dep.

Horner's cruiser sat unlocked, running, with the key in the ignition, and the lights on.[28]

60.    Anthony reached the driver's side of the cruiser at 4:51. Dep. Horner

chased him from behind, and when he reached the passenger's side, again tried to

pepper-spray Anthony.[29] Anthony got into the driver's seat at 4:57.[30]

61.    Putting himself in harm's way, Dep. Horner jumped into the passenger-

side of the cruiser as the vehicle began to move toward the backyard.[31]

---

[28]The TBI summary of the interview with Dep. Horner indicates that after
Anthony slapped at Dep. Horner's hand as Dep. Horner was trying to pepper-spray
him, Anthony "had something in his hand." The TBI stated that Dep. Horner
thought Anthony may have had his Taser. The video, however, shows something
very different: after Dep. Horner had tased him, kicked him, jumped on his back,
strong-armed his neck and smashed his face into the dirt, and pepper-sprayed him,
Anthony broke free of Dep. Horner, picked up a flashlight – probably Dep. Horner's
– and started to run away, not knowing what Dep. Horner planned next.

[29]Dep. Horner told SA Stoner: "I remember standing on the passenger side,
pepper spraying him over the car." The TBI reported that Dep. Horner's use of
pepper-spray on Anthony had "no effect."

[30]Dep. Horner told SA Stoner: "He takes off towards my car. Somehow he gets
in it." Obviously, the cruiser door was unlocked.

[31]According to the TBI, Dep. Horner stated that there were several items in
the passenger seat that did not allow him to sit there. Dep. Horner told SA Stoner:
"I try to squeeze in there to try and stop him." He eventually got into the seat on his
knees facing Anthony in the driver's seat ( "[I was] on my knees, facing him."). Dep.
Horner then saw Anthony "put the car in 'drive' and take off." ("I remember him
putting it in drive."). Although the TBI report indicates Dep. Horner said he "was
hanging out of the cruiser" and being "dragged," this is not supported by the video,
which does not reveal that any part of Dep. Horner's body was outside of the cruiser
at this point. Nor did any witness say anything about Dep. Horner being "dragged."

62.     In his recorded TBI interview with SA Stoner, Dep. Horner candidly admits that his memory of what happened next is "fuzzy."[32] Over the next fifteen (15) seconds or so – during which Dep. Horner shoots Anthony multiple times at two separate intervals – the cruiser travels for a short distance before careening into thick brush, coming to a stop in a wooded area.[33]

### G.     Dep. Horner Fired and Shot Anthony at Point-Blank Range and Without Warning, Just Seconds After He Climbed Into the Passenger Side of the Cruiser.

63.     In his TBI narrative, Dep. Horner attempted to justify his next actions by saying, "I knew that I was gonna die right then." At 5:04, Anthony, shirtless and unarmed, was in the driver's seat. Dep. Horner's Glock 17 was just inches away from the right side of Anthony's torso.[34] At 5:05, Dep. Horner shot Anthony once at point-

_____

[32]In his recorded TBI interview with SA Stoner, Dep. Horner stated: "Somehow he gets in the car and that's where it gets fuzzy. I remember him getting in the car. Me trying to get in the passenger's seat."

[33]Dep. Horner told SA Stoner he had no idea how fast the car was going. He did, however, imply that the cruiser was "moving fairly quickly." This is not so. According to the TBI Investigative Report, the cruiser traveled about 654 feet from the driveway before coming to rest in the brush. According to the video, the cruiser traveled this distance over the span of exactly 23 seconds. A simple mathematical calculation would indicate the average speed of the cruiser over that distance was about 28 miles per hour. In comparison, elite athletes can run on foot at around 26 miles per hour. Not surprisingly, Dep. Horner's airbag failed to deploy at any point, even after the cruiser ran through a boundary-fence and came to a stop in the thick brush. The gist of this is that the cruiser was not traveling "fast" at all, and Dep. Horner's suggestion to the contrary was simply wrong.

[34]The TBI reported that there was a "struggle" between the men for the gun, but Dep. Horner's statement does not reference a "struggle" inside the car for the gun, nor does the video show Anthony ever in possession or control of Dep. Horner's Glock 17. The TBI's summation and conclusion, at p. 96, reports that "Zappier grabbed the weapon and fought with Horner. Horner regained control of the weapon

-25-

blank range, as the muzzle flashes, and caused the teenager's body to convulse, as he

screamed, "no, no, no." Blood splattered on Anthony's right arm and white shorts, as

he reached toward Dep. Horner's gun to shield himself another shot.

### H. Dep. Horner Got Out of the Cruiser, Withdrew to Safety, and Executed the Seriously-Wounded Anthony By Firing Two More Shots Into Him From Close Range.

64. By then, the cruiser had rolled into thick brush and come to a gentle stop

just beyond a plowed field.[35] At this instant, Dep. Horner, who had backed all the way

out of the cruiser and stood outside the vehicle, told Anthony to "relax" (just as he had

done before he tased him earlier). At 5:18, Dep. Horner tried to shoot Anthony again,

but his gun jammed, prompting him to rack the slide several times to "clear" it, as

Anthony says "help, help."[36]

---

and fired three rounds striking Zappier in the head and chest. Zappier immediately
fell unresponsive and the vehicle came to a stop past a garden/fence row adjacent to
the yard/field behind . . . ." At most, the video shows Anthony stretching out his
hand trying to shield himself from gunfire. He never took "control" of Dep. Horner's
gun. Nor was there a struggle for it.

[35]"The car got stopped," is what Dep. Horner told SA Stoner during his
recorded interview.

[36]Dep. Horner told SA Stoner, "I cleared it and went back to trying to get him
to stop." But by then, the cruiser had clearly stopped, and by 5:19, Dep. Horner
stood outside of the cruiser with his gun drawn.

-26-

65.    Five seconds later, at 5:23, Dep. Horner inexplicably reached back into the cruiser, extended his arm toward a gunshot Anthony, Dep. Horner's hand gripping his Glock 17, and at 5:23-25, fired two or three more rapid rounds, striking Anthony two more times.[37] One of those two shots undoubtedly was a fatal shot by Dep. Horner that struck Anthony near the crown of his head, just as his body and head started falling toward the passenger seat from the previous gunshot(s). Dep. Horner told SA Stoner in his recorded interview, "I think I fired three or four rounds."[38]

66.    At no point in time did Dep. Horner warn Anthony that he was going to shoot him . . . *either the first time or the second time*. Trying to explain during his recorded TBI interview with SA Stoner, Dep. Horner said that he did not have "anything left on his belt" that he could use against Anthony, so he drew his gun and shot him . . . and then he shot him two more times. He never addressed why he failed to warn him or why he may have had reason to believe such a warning – which was constitutionally required, if feasible – would have been futile.

---

[37]Dep. Horner told SA Stoner: "I remember that my gun jammed, I think after the first shot. I racked it. I shot two, maybe three more times after that."

[38]Dep. Horner told SA Stoner, "I pulled my pistol and fired approximately one time when my firearm jammed. I racked the slide (I'm not sure how many times) to clear the weapon and then fired several (2 to 3) more shots. I'm not entirely sure how many shots." Dep. Horner told SA Stoner that he shot Anthony the first time because he "was afraid" for his life and knew that if he "didn't stop him from continuing to drive," he "was going to die." This does not explain why he shot Anthony – already gunshot – two more times, especially after the cruiser had stopped rolling, and Dep. Horner stood outside in relative safety.

-27-

67.     At 5:30-35 of the video, a dispatcher announced, "shots fired, shots fired, shots fired."[39] At 5:38-31, Dep. Horner's hand can be seen on video gripping the Glock 17,[40] as he breathed heavily.[41]

68.     Deputies Statler D. Collins and Doyle Davis arrived "approx. 30 seconds to 1 minute" after the "shots fired" transmission.

69.     At 6:03, Dep. Horner grabbed the door handle of the driver's side door, hesitated, and at 6:07, opened the door. At about 6:20, Dep. Horner dragged Anthony's body partially out of the cruiser onto the ground. At 6:31, he told other deputies to

---

[39]The TBI reported that while Dep. Horner was in the passenger's side of the cruiser, he pulled his service weapon and fired it at Anthony multiple times, striking him several times. Of course, it is undisputed Dep. Horner fired his Glock 17 at Anthony multiple times. However, the report is misleading in that Dep. Horner shot Anthony once, got out of the cruiser when the cruiser stopped, and as he stood safely outside the cruiser, shot Anthony two more times.

[40]A Nashville Crime Lab forensic report shows that thirteen (13) rounds remained in Dep. Horner's gun-magazine when it was surrendered. A Glock 17 magazine would normally hold seventeen (17) rounds, without an extension. Three rounds hit Anthony. There is no further forensic analysis regarding the whereabouts of the missing fourth bullet. However, as Dep. Horner is doing "chest compressions" on Anthony, the video reveals a bullet hole in the driver's side window. This may have been the fourth bullet, or it may have been the bullet that hit Anthony's right maxilla and exited "through the helix and antihelix of the ear."

[41]Dep. Horner told SA Stoner that the cruiser was still moving when he fired all three shots. This is not true. According to the video, Dep. Horner was standing in a stationary position on the ground outside of the passenger's compartment when he fired the final two or three shots.

-28-

"bring your medic bag with you." At 6:37, dispatch asked Dep. Horner if he was injured, and he responded, "I don't know yet." At 6:57, Dep. Horner started tending to Anthony, and started what he generously described as "chest compressions."[42]

70.     About thirty seconds later, at 7:25, sirens are heard on the recording, as Dep. Horner continued "chest compressions." At about 8:00, Dep. Horner told another deputy who had arrived that "there's a gun somewhere over there in that field," and repeated the statement.

71.     For more than three minutes, from about 8:20 to 11:45, the video depicts Anthony's lifeless body on the ground outside the cruiser, the right side of his torso and white shorts spattered with blood. While the video is taken from Dep. Horner's vantage point, to the left of Anthony's body, the right side of Anthony's head and face were reflected on the cruiser's shiny exterior, and revealed Anthony's now grossly-contorted face, where one bullet had pierced his jaw and another had exploded through the top of his head into his mouth.[43]

---

[42]Although Dep. Horner told SA Stoner that "once the vehicle stopped, I got out of the passenger side and pulled the subject out of the driver's seat and began CPR until backup arrived," this is not true, as Dep. Horner exited the cruiser only after it had come to a complete stop. He then told Anthony to "relax man" and pumped two more shots into Anthony, including at least one to his head. Only then does Dep. Horner go around to the driver's side and drag Anthony's body partially out of the cruiser. Although he did begin some rudimentary form of "chest compressions," he by no means ever administered CPR to Anthony.

[43]Following the shooting, as other law enforcement personnel appear on the scene, Dep. Horner made several relevant statements. For example,

■ at 8:58-59, Dep. Horner tells another officer, "my car door must have come unlocked when we was fighting. Maybe I was close enough to it. I don't know."

## I. Medical Examiner's Final Autopsy Report: Anthony's Cause of Death Was Multiple Gunshot Wounds.

72. On December 16, 2019, William R. Oliver, MD, of the Regional Forensic Center – Knox County, presented Anthony's final autopsy report, indicating that Anthony's cause of death was "multiple gunshot wounds" and classifying the death as a "homicide." The gunshot wounds were identified as follows:

> ▪ indeterminate range gunshot wound to the head (this shot entered near the crown, the path was sharply downward, and the bullet was retrieved from Anthony's mouth);
>
> ▪ indeterminate range gunshot wound of the left maxilla (this shot extended through the soft tissues of the face and exited through Anthony's ear); and
>
> ▪ intermediate range gunshot wound of right chest (this shot perforated Anthony's right lung, inferior vena cava, vertebral body, and left lung, causing a massive hemorrhage and the bullet was retrieved from Anthony's left back).

73. The autopsy report concluded that "both the wounds to the head and the chest would have been rapidly fatal."

---

> ▪ at 9:05, Dep. Horner told an officer, "he . . . got in the car. I jumped in the passenger's seat."
>
> ▪ at 9:09, Dep. Horner said, "he puts it in 'drive' and takes off and I'm hanging out of the car" (notably, this remark does not support TBI's finding that Dep. Horner had been "dragged," which is contradicted by video footage).
>
> ▪ at 12:40, Dep. Horner tells another deputy, "I didn't want to shoot him, but damn, I was scared."

-30-

**J.** **The TBI Conducted a Sham Investigation and Implicitly Exonerated Dep. Horner, Notwithstanding His Execution of an Unarmed Teenager.**

74. On October 25, 2019, the Third Judicial District Attorney requested the assistance of the Tennessee Bureau of Investigation ("TBI") in the shooting.

75. Although TBI Special Agent Brian Fraley ("SA Fraley") and other agents watched the entire video, interviewed Dep. Horner and several witnesses, reviewed and inventoried all of the evidence from the scene, the TBI's final Investigative Report was fraught with factual errors and omissions, including, most notably, the following:

■ First, the TBI report stated that Anthony got on the ground so that Dep. Horner could "affect his arrest," but Dep. Horner never stated that he was arresting Anthony, and never made an effort to handcuff him. He said that he only wanted to do a "weapons check," which was quickly agreed to by Anthony.

■ Second, the TBI report stated that Dep. Horner was "dragged" by the cruiser being driven by Anthony. [Report, at pp. 79, 96]. Yet, at no time did Dep. Horner ever state that he was "dragged" by the cruiser. Not a single witness referenced him being "dragged." And the video does not show him being "dragged."

■ Third, the TBI report stated there was a "struggle" over Dep. Horner's duty weapon and implied that Anthony actually took Dep. Horner's 9 mm Glock 17 away from him at some point. [Report, at p. 96]. Neither Dep. Horner's interview/statement nor the video supports this statement, as Anthony never attempted to gain possession of the gun. At most, Anthony attempted to shield his face from Dep. Horner's gunfire with his right hand.

■ Fourth, the TBI report stated that "at some point after the vehicle was in motion, [Dep.] Horner fired his weapon, a Glock 9mm, at Zappier multiple times resulting in his death." This is not true. At least three shots were fired by

-31-

Dep. Horner at two intervals and from two distinct positions. One shot was fired at very close range from inside the cruiser. Two shots were fired by Dep. Horner not only after the cruiser had stopped moving, but after he had seriously wounded Anthony with one gunshot, had exited the cruiser, and was standing safely outside of it.

76.     Surprisingly, after collecting voluminous information during its two-month long investigation, the TBI report appears to have made no recommendation. It simply turned its investigative findings over to a grand jury. There is no indication in the TBI file turned over to Plaintiffs' counsel as to whether the District Attorney advocated for charges against Dep. Horner.

77.     On January 6, 2020, the TBI released its Investigative Report, and reported that the investigation was closed.

78.     By implicitly exonerating Dep. Horner for his use-of-force, the TBI disregarded the actual evidence. Put simply, the TBI paid little attention to whether Dep. Horner had probable cause to believe Anthony posed an imminent serious physical threat before (a) repeatedly tasing Anthony; (b) kicking Anthony, jumping on his back, using his forearm against the back of Anthony's neck smashing his face into the ground; (c) repeatedly pepper-spraying Anthony; (d) shooting Anthony the first time, from inside the cruiser; and (e) shooting Anthony the second and third times, after Dep. Horner had withdrawn to safety outside of the cruiser.

-32-

79.     Even if Dep. Horner's actions leading up to the second gunshots fired at Anthony were justifiable (they were not), his firing into the cruiser and shooting Anthony two more times – as Dep. Horner was safely outside – was not a reasonable use of deadly force. At that moment, Anthony did not pose a threat to anyone.

80.     On January 13, 2020, the TBI's flawed findings were presented to a Hamblen County Grand Jury, which found that Dep. Horner "followed law enforcement protocols."

### K.     Dep. Horner Failed to Warn Anthony Before Shooting Him on Both Occasions.

81.     Under *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), Dep. Horner also had a legal obligation to warn Anthony that he was going to fire at him, when feasible, under the circumstances. Under the circumstances, it was entirely feasible for Dep. Horner to have warned Anthony *both times* that he was getting ready to shoot him. Yet, Dep. Horner failed to warn Anthony before he fired at him on either occasion.

82.     Dep. Horner could have warned Anthony from the moment he decided to jump into passenger's side of the cruiser. He certainly could have warned Anthony that he was going to fire the second, third, and fourth times after Dep. Horner had gotten out of the cruiser, as the cruiser had come to a stop in the thick brush, and Anthony had been seriously-wounded at that point. Of course, there was no reason to shoot Anthony the first time, much less the second time, or the third time. When he exited the cruiser, Dep. Horner was out of any danger, if he was ever in danger to begin with.

-33-

## V. WAIVER OF IMMUNITY

83.     The County has waived immunity for its own negligence and for its employees, misconduct of officers acting under color of law, and for the negligence of deputies, as set out in Tenn. Code Ann. § 29-20-305. There is no immunity for individuals for criminal conduct, or conduct which is willful or malicious.

## VI. CLAIMS FOR RELIEF

### COUNT ONE

### EXCESSIVE FORCE

### Violation of Civil Rights under Color of Law, 42 U.S.C. §§ 1983 and 1988, Under Fourth and Fourteenth Amendments

### (Against Dep. Horner, Individually)

84.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

### *Fatally Shooting Anthony*

85.     Dep. Horner used excessive force when he shot and killed Anthony. His unjustified shooting deprived Anthony of his fundamental interest in life and his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution, as applied to state actors by the Fourteenth Amendment.

86.     Lethal force, such as that used by Dep. Horner against Anthony, is only authorized, in accordance to Tenn. Code Ann. § 39-11-620, to effect an arrest only if all other reasonable means of apprehension have been exhausted or are unavailable, and

where feasible, the officer has given notice of the officer's identity as such and given a warning that lethal force may be used unless resistance or flight ceases, and:

>    A.    The officer has probable cause to believe the individual to be arrested has committed a felony involving the infliction or threatened infliction of serious bodily injury; or
>
>    B.    The officer has probable cause to believe that the individual to be arrested poses a threat of serious bodily injury, either to the officer or to others unless immediately apprehended.

87.    When Dep. Horner fired a single round at Anthony from his Glock 17, he had not yet exhausted all other reasonable means of apprehension, including many force-options available to officers when a subject is "passively resistant, active resistant and/or actively aggressive."

88.    Regardless of whether Dep. Horner was justified in shooting Anthony the first time (and he was not), video evidence demonstrates that at the moment Dep. Horner shot Anthony the second and third times, he lacked a reasonable belief or probable cause to believe Anthony posed a threat of serious bodily injury. He also lacked reasonable grounds to believe Anthony posed an imminent real danger of death or serious bodily injury.

89.    When Dep. Horner fired all three shots, Anthony was unarmed. When Dep. Horner fired his last two shots, he had withdrawn to safety outside of the cruiser and Anthony was suffering from a gunshot wound.

90.    No reasonable officer under the circumstances would have believed that the use of deadly force against Anthony – *on both occasions* – was lawful. Dep. Horner

-35-

thus lacked probable cause or reasonable suspicion to believe Anthony posed an imminent danger of death or serious physical harm to him (or to others). Even if some force were constitutionally reasonable (it was not), the degree of force used – shooting Anthony three times, twice from outside the cruiser – was clearly excessive and unconstitutionally disproportionate to the circumstances.

91. In addition to unreasonably using deadly force against Anthony, Dep, Horner also failed to warn Anthony that he was going to shoot to kill him on two separate occasions. His failure was striking, even making allowance for the fact that officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving, as the Supreme Court emphasized 35 years ago the importance of warnings when feasible before using lethal force. *See Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985). Nor can Dep. Horner's omission of any meaningful warning in this instance be excused by inferring that the circumstances were too "tense, uncertain, and rapidly evolving" to undercut foundational principles of law enforcement conduct.

92. Dep. Horner's use of deadly force in shooting Anthony was not legally justified or objectively reasonable and violated Anthony's rights to be free of unreasonable seizure and use of excessive force under the Fourth Amendment. *E.g., Tennessee v. Garner*, 471 U.S. 1, 12-12, 21(1985); *Graham v. O'Connor*, 490 U.S. 386, 396 (1989). This right to be free of the use of objectively unreasonable deadly force was also clearly established at the time and had been so for decades.

-36-

### *Tasing, Pepper-Spraying, Kicking, Strong-Arming,*
### *and Jumping On Top of Anthony's Back*

93.     Part of the defensive tactics for an officer is to diffuse a situation from the outset until backup arrives. The last thing an officer should want to do is go "hands-on" with someone. Yet, Dep. Horner quickly decided to do so with Anthony, unnecessarily and unreasonably escalating the situation into a physical confrontation.

94.     Dep. Horner tased Anthony multiple times as Anthony was complying with his command to "get on the ground." Anthony was unarmed, on his back and on the ground, begging Dep. Horner to help him when Dep. Horner tased him.

95.     Dep. Horner kicked Anthony hard in the back as he was unarmed and on his knees. He then jumped on Anthony's back, put his forearm against the back of his neck, and smashed his face into the ground. After Anthony was able to free himself, Dep. Horner then pepper-sprayed him.

96.     Anthony died from multiple gunshot wounds. But prior to this, Dep. Horner's actions and omissions, including his unreasonable and unjustified use of non-deadly and deadly force against Anthony, injured Anthony and the gunshots proximately caused his death. His actions and omissions deprived Anthony of his fundamental interest in life, in violation of the United States Constitution. As a result, Dep. Horner is liable for Anthony's death.

97.     Specifically, Dep. Horner's violations of Anthony's Fourth Amendment rights directly and proximately caused Anthony to suffer (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish,

despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Anthony's estate, through Plaintiffs; and (f) the loss of society and companionship for Anthony's parents.

98.     Furthermore, the conduct of Dep. Horner was also willful, wanton, malicious, deliberately indifferent, and done with reckless disregard for Anthony's federally-protected rights, justifying an award of punitive damages against him so as to prevent a recurrence of such misconduct and to deter others from engaging in similar misconduct. and therefore warrants the imposition of punitive damages.

99.     Plaintiffs sue Dep. Horner for violating Anthony's constitutional rights, and seeks any and all damages allowable, attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT TWO

## FAILURE TO TRAIN AND SUPERVISE

### Violation of Civil Rights under Color of Law,
### 42 U.S.C. §§ 1983 and 1988 under Fourth and Fourteenth Amendments

### (Against the County and Sheriff Jarnagin, Individually)

100.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

-38-

101.     As Sheriff, Sheriff Jarnagin has final authority and makes policy for the County and HCSO in establishing and implementing policies and/or procedures with respect to the use of force by deputies against citizens (including both less-lethal and deadly force) and the legal limits of such activities for deputies employed by the HCSO.

102.     Here, the unconstitutional consequences of failing to train officers in the reasonable and justifiable use of deadly force are so patently obvious that the County and Sheriff Jarnagin are liable under § 1983. Dep. Horner's actions –

   ■ the unnecessary tasing of and physical attack on Anthony that escalated the confrontation;

   ■ the complete failure to utilize the force-continuum in choosing which methods of force to utilize on Anthony;

   ■ the failure to effectively use non-deadly or even less-deadly force; and

   ■ the unnecessary and unreasonable use of deadly force without warning against Anthony –

demonstrate such obvious and egregious training and supervisory deficiencies to make HCSO's use-of-force training constitutionally defective.

103.     Upon information and belief, as final policymaker for the HCSO, Sheriff Jarnagin established and implemented policies and procedures, and/or ratified pre-existing policies and procedures, regarding the use of force by HCSO deputies against citizens (including less-lethal and deadly force), which policies and procedures themselves violate federal constitutional law.

104.     Even if the policies and procedures regarding the use of force by deputies against citizens (including both less-lethal and deadly force) do not themselves violate

-39-

federal law, there is and was – at the time of the deadly encounter between Dep. Horner and Anthony – a persistent and widespread practice among HCSO deputies of using excessive and/or deadly force on a subject when it is unnecessary and objectively unreasonable as a matter of law to do so, amounting to a custom or course of conduct so widespread as to become informal HCSO policy, acquiring the force of law.

105.    And even if the formal policies and procedures of the HCSO are not themselves unlawful, alternatively, the operation of such policies and procedures "on the street" reflects a standard operating procedure, and a widespread and persistent practice, of HCSO deputies violating citizens' federally-protected rights as identified herein.

106.    At all times material, Sheriff Jarnagin and the County have known or have had constructive knowledge of this widespread and persistent practice of violations, but have refused or failed to take measures reasonably necessary to prevent or minimize such violations.

107.    The response by Sheriff Jarnagin and the County to these constitutional violations has been inadequate.  These include but are not limited to:

- the lack of or inadequate mechanism for identifying or tracking unconstitutional uses of force;

- the lack of or inadequate documentation of individual uses of force, and the justification for such;

- the lack of or inadequate supervisory review of documentation of individual uses of force and the justification for such;

-40-

■ the lack of or inadequate mechanism for monitoring or tracking uses of force;

■ the lack of unbiased investigation of complaints of improper uses of force;

■ the lack of or inadequate investigation of complaints of improper uses of force;

■ the lack of or inadequate training regarding the legal limitations on the permissible use of force, both less-lethal and deadly force; and

■ the lack of or inadequate discipline of individual officers found to have committed unlawful uses of force.

108.  Violations of citizens' constitutional rights of the type inflicted on Anthony, specifically the use of excessive and deadly force, are the known or obvious consequences either of formal County or HCSO policies and procedures that violate federal law, or of a widespread and persistent practice and custom of such violations to which Sheriff Jarnagin and the County have acquiesced or have tacitly authorized. The actions and omissions of Sheriff Jarnagin and the County, as identified herein, reflect deliberate indifference on the part of Sheriff Jarnagin and the County to such known or obvious consequences of their actions and omissions, as resulted in the deprivation of Anthony's federally-protected rights.

109.  Such widespread and persistent violations of citizens' constitutional rights, as condoned by Sheriff Jarnagin and the County, were the moving force behind – and directly and proximately caused – the violations of Anthony's constitutional rights and his death; and render Sheriff Jarnagin and the County liable.

-41-

110.     The County, HCSO, and Sheriff Jarnagin failed to train and supervise their deputies to avoid using excessive force, including less-lethal and deadly force, failed to meaningfully investigate allegations of such force, and attempted to conceal unconstitutional conduct by failing to conduct transparent investigations, and by unreasonably exonerating officers, like Dep. Horner, through sham investigations or no investigations at all, rather than searching for justice.

111.     The County, HCSO, and Sheriff Jarnagin had a duty of care to ensure that HCSO officers were properly trained in the appropriate procedure for using deadly force against citizens. This duty extends to ensuring that HCSO officers were properly trained concerning the limits of their authority to use deadly force.

112.     The County, HCSO, and Sheriff Jarnagin had a duty to properly supervise HCSO officers and ensure HCSO supervisory officers did not condone the unnecessary uses of force, including deadly force. This is especially true when there is (a) a "likelihood that [a] situation will recur" (b) with such a "high degree of predictability" that "an officer lacking specific tools to handle that situation will violate citizens' rights." Deputies must have specific training to be equipped to properly react to situations, as in this case, without unnecessarily escalating them to force situations.

113.     In this case, Dep. Horner lacked the tools that the County, HCSO, and Sheriff Jarnagin should have provided him to safely handle the situation with Anthony. Consequently, he unnecessarily escalated the level of force and needlessly executing a citizen, over what began as a routine investigation of a misdemeanor offense.

-42-

114.    By not conducting a meaningful investigation of Dep. Horner, especially after the TBI botched its investigated of his actions, Sheriff Jarnagin let it be known that he condoned Dep. Horner's unreasonable use-of-deadly force.

115.    By ratifying Dep. Horner's unreasonable use-of-force and deadly force, Sheriff Jarnagin knowingly acquiesced in the unconstitutional conduct of Dep. Horner through the execution of his job function, rendering the County liable to Plaintiffs.

116.    The County, HCSO, and Sheriff Jarnagin's failure to develop and promulgate lawful policies outlining the guidelines for such situations and the appropriate use-of-force and to properly train its officers and supervisors to follow such guidelines constitute deliberate indifference to the constitutional rights of citizens.

117.    The failure of Sheriff Jarnagin – and unknown supervisors – to recognize or appreciate the gravity of Dep. Horner's actions imply that they found no wrong in his conduct, all but "green lighting" Fourth Amendment violations by HCSO deputies.

118.    Here, Dep. Horner believed that his actions – including executing the unarmed Anthony with two unnecessary gunshots – would not be properly monitored or corrected by supervisory officers and that his misconduct would be tolerated and accepted. His belief was prescient.

119.    As a direct and proximate result of the actions/omissions of the County, HCSO, and Sheriff Jarnagin causing the violation of his Fourth Amendment rights, Anthony suffered (a) excruciating physical pain and suffering before his death; (b) severe emotional suffering and mental anguish, despair, and hopelessness before his death; (c) lost earnings and/or loss of earning capacity in the future based on the

-43-

probable duration of his life if his death had not occurred; (d) loss of the enjoyment of the remainder of the probable duration of his life if his death had not occurred; (e) funeral and burial expenses, all of which are recoverable by Anthony's Estate. Plaintiffs also seek recovery for having lost Anthony's society and companionship.

120.     Plaintiffs sue the County and Sheriff Jarnagin for violating Anthony's constitutional rights, and seeks any and all damages allowable to them, both individually and as personal representatives of Anthony's Estate, as well as attorney's fees pursuant to 42 U.S.C. § 1988, costs, and discretionary costs.

## COUNT THREE

## WRONGFUL DEATH

## TENN. CODE ANN. §§ 20-5-106 et seq.

### (Against the County, Sheriff Jarnagin, Individually, and Dep. Horner, Individually)

121.     The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

122.     Plaintiffs bring this action as the Court-appointed Administrators and Personal Representatives of the Estate of Anthony Zappier, as authorized by Tenn. Code Ann. §§ 20-5-106 et seq., Tennessee's Wrongful Death Statute, and as parents seeking damages for loss of their son's consortium and society. Anthony was not married, did not have a surviving spouse, and had no children.

123.     Defendants owed a duty of due care to Anthony at all times relevant to this action, and violated that duty in the manner alleged herein.

-44-

124.     Dep. Horner knew that Anthony was unarmed when he fired at him on two separate occasions, resulting in multiple gunshot wounds that resulted in Anthony's death. Anthony posed no threat to Dep. Horner's safety – imminent or otherwise – at that moment.

125.     Dep. Horner's second, third, and fourth rounds of gunshots were directed at Anthony inside the stopped cruiser after Anthony was seriously-wounded and after Dep. Horner had withdrawn to safety outside of the cruiser, resembling nothing short of an execution that was subsequently directly or implicitly sanctioned by the TBI, Sheriff Jarnagin, and the County.

126.     The foregoing acts of Dep. Horner proximately caused the fatal injuries to Anthony, entitling Plaintiffs to recover compensatory damages from Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Anthony had before his death, Anthony's lost wages, funeral, and/or related burial expenses, and loss of society and companionship for Anthony's parents.

127.     The intentional and negligent actions of Defendants were performed knowingly, wantonly and with gross disregard for the safety and welfare of Anthony.

128.     Based upon the foregoing allegations of this Complaint, Plaintiffs are entitled to recover a judgment in the amount of Ten-Million Dollars ($10,000,000) in compensatory damages and Fifteen Million Dollars ($15,000,000) in punitive damages.

# COUNT FOUR

## BATTERY

### (Against the County and Dep. Horner, Individually)

129.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

130.    The fatal shooting of Anthony by Dep. Horner, acting under color of law and in the course and scope of his employment for the County and HCSO, constitutes a battery.

131.    As a direct and proximate result of the actions of Dep. Horner, Anthony suffered severe pain and suffering, and died from his injuries. Dep. Horner had no legal justification for using force – especially deadly force – against Anthony, and Dep. Horner's use of such force while carrying out his duties was unreasonable under the circumstances. As such, Dep. Horner's tasing, kicking, strong-arming, and shooting of Anthony all constituted battery under Tennessee law.

132.    The foregoing acts of Dep. Horner proximately caused the injuries to Anthony, including his death, entitling Plaintiffs to recover compensatory damages from the County and Dep. Horner for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Anthony suffered before his death, Anthony's lost wages, funeral, and/or related burial expenses, and Anthony's parents' having lost their society and companionship.

-46-

133.    The conduct of Dep. Horner was malicious, wanton, oppressive, and accomplished with a conscious disregard for Anthony's rights, entitling Plaintiffs to an award of punitive damages.

## COUNT FIVE

## NEGLIGENCE

### (Against the County, Sheriff Jarnagin, Individually, and Dep. Horner, Individually)

134.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

135.    Defendants had a duty to Anthony to act with ordinary care and prudence so as not to cause him harm or injury.

136.    The actions of Defendants were negligent and reckless, including but not limited to, the use-of-force against Anthony, which culminated in his death.

137.    Defendants owed a duty to the public in general and specifically to Anthony to use due care in fulfilling their duties and to ensure their conduct conformed to applicable laws, policies, procedures, and generally accepted law enforcement standards. As described above, Defendants breached their duties of due care and were negligent, grossly negligent, reckless, willful, and wanton in all of the foregoing particulars.

138.    Pursuant to the Tennessee Governmental Tort Liability Act, these Defendants also owed Anthony a duty of care to be free from excessive force and to protect him from injury.

139.    As a direct and proximate result of Defendants' conduct, as alleged above, and other undiscovered negligent conduct, Anthony was caused to suffer severe pain and suffering and death.

140.    The foregoing acts of Dep. Horner proximately caused the fatal injuries to Anthony, entitling Plaintiffs to recover compensatory damages from Defendants for such damages. Said damages include, but are not limited to, the tremendous pain and suffering Anthony suffered before his death, his lost wages, funeral, and/or related burial expenses, and his parents' having lost Anthony's society and companionship.

## COUNT SIX

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

## (Against Dep. Horner, Individually)

141.    The allegations of the preceding paragraphs of this Complaint are hereby incorporated by reference, as if set forth verbatim.

142.    The actions alleged herein against the Dep. Horner were outrageous and utterly intolerable in a civilized society, and were done with a reckless disregard of the probability of causing emotional distress.

143.    From almost the moment Dep. Horner encountered Anthony, he unnecessarily and unreasonably escalated the situation – creating a serious risk of harm or death for Anthony which culminated in Dep. Horner fatally shooting Anthony, in nothing short of an execution.

144.    Dep. Horner's conduct was perpetrated with the intent to inflict, or with reckless disregard of the probability of inflicting, mental anguish on Anthony.

-48-

145. The aforementioned acts were done knowingly, intentionally, and maliciously, for the purpose of oppression and inflicting injury upon Anthony, and in reckless, wanton and callous disregard of his safety, security, and civil rights. By reason thereof, Plaintiffs claim compensatory damages of $10,000,000 as well as punitive damages of $15,000,000 (or in an amount to be proven at trial) sufficient to punish and deter Dep. Horner and others in similarly situated from engaging in similar conduct in the future.

146. The County is also liable to Plaintiffs under Tenn. Code Ann. § 8-8-301, et seq.

## VII. JURY DEMAND

147. Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all of the claims asserted in this Complaint so triable.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray:

A. That Defendants be served with a copy of this Complaint and be required to answer;

B. That the Court find that Defendants have engaged in the conduct and statutory and common law violations alleged herein;

-49-

C.     That Plaintiffs, as personal representatives of Anthony's Estate, and individually, where appropriate, be awarded such damages as will fully compensate the Estate and Plaintiffs for all injuries proximately caused by Defendants' actions and that a judgment in Plaintiffs' favor be entered;

D.     That Plaintiffs, as personal representatives of Anthony's Estate, and individually, where appropriate, be awarded $10,000,000 in compensatory damages;

E.     That Plaintiffs, as personal representatives of Anthony's Estate, be awarded $15,000,000 in punitive damages;

F.     That Plaintiffs have and recover costs for this suit, including reasonable attorneys' fees and discretionary costs, as provided by law; and

G.     That Plaintiffs be awarded pre-judgment and post-judgment interest as permitted by common law or applicable statute and such other or further relief as may be just and proper.

Respectfully submitted, this 26th day of October, 2020.

/s/ Lance K. Baker
Lance K. Baker
Tenn. Bar #: 032945
**THE BAKER LAW FIRM**
550 Main Street, Suite 600
Knoxville, TN 37902
Tel: (865) 200-4117
Fax: (865) 437-3370
lance@lbakerlawfirm.com

F. Clinton Little, Esq.
Tenn. Bar #: 033412
**LAW OFFICE OF F. CLINTON LITTLE**
Landmark Center Pavilion
1111 N. Northshore Dr.
Suite P-295
Knoxville, TN 37919
Tel:  865-622-4628
Fax:  865-315-7086
clinton@knoxvilleattorney.law

Luke D. Durham, Esq.
Tenn. Bar #: 031106
**TARPY, COX, FLEISHMAN &**
   **LEVEILLE, P.L.L.C.**
Landmark Center North Tower
1111 N. Northshore Drive
Suite N-290
Knoxville, Tennessee  37919
Tel: 865-588-1096
Fax:  865-588-1171
ldurham@tcflattorneys.com

.            *Counsel for Plaintiff*